# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JASON PIETRZYCKI, on behalf of himself )
and all other plaintiffs similarly situated, )
                            )
              **Plaintiff,** )    **No. 14-cv-6546**
                            )
              **v.** )    **Jeffrey T. Gilbert**
                            )    **Magistrate Judge**
HEIGHTS TOWER SERVICE, INC., )
and MARK MOTTER, )
                            )
              **Defendants.** )

## MEMORANDUM OPINION AND ORDER

Plaintiff Jason Pietrzycki ("Pietrzycki") has sued Defendants Heights Tower Service, Inc.

("HTS") and Mark Motter ("Motter"), alleging violations of the Illinois Minimum Wage Law

("IMWL"), 820 ILL. COMP. STAT. § 105/1 *et seq.*, and the Fair Labor Standards Act ("FLSA"),

29 U.S.C. § 201 *et seq.* [ECF No. 74.] Early last year, the Court, at the joint request of the

parties, conditionally certified an FLSA collective action. [ECF Nos. 30, 34.] Pietrzycki has

now moved to certify a class of Illinois workers for the IMWL claim pursuant to Federal Rule of

Civil Procedure 23. [ECF No. 86.] Defendants oppose certification of a Rule 23 class and move

to decertify the FLSA collective action. [ECF No. 93.] For the reasons stated below,

Pietrzycki's Amended Motion for Class Certification [ECF No. 86] is granted, and Defendants'

Motion for FLSA Decertification [ECF No. 93] is denied.

## I. BACKGROUND

Motter owns and is the president of HTS, a company that services and upgrades cellular

towers ("towers"). Rule 30(b)(6) Deposition of Matthew Overholt (HTS's Controller)

("Overholt Dep."), ECF No. 94-1, at 6:5-8, 121:8-14. At one point, HTS had about seventy-

seven employees. *Id.* at 7:8-10. Twenty-three of those employees performed office jobs. *Id.* at 7:11-15. The other fifty-four worked in the field servicing the towers. *Id.* at 7:11-21. Although the number of workers employed by HTS fluctuated over time, these totals are representative of the size of HTS's workforce throughout the relevant period. Regardless, HTS called the employees who serviced the towers "operations employees." *Id.* Of those, some were "foremen" and the others were "tower technicians." *Id.* Tower technicians serviced the cell towers: they installed antennas, ran cables, and so on. *Id.* at 8:5-16, 10:4-7. Foremen also climbed and serviced the towers. But they had many additional responsibilities. *Id.* at 9:17-10:3-19. Foremen told tower technicians what to do, supervised them as they did it, and completed daily activity reports tracking what was done. *Id.*

To service a tower, HTS usually sent a four-person crew. *Id.* at 7:16-21. Each crew typically consisted of one foreman and three tower technicians. *Id.* But a crew's membership was not set, meaning each crew for each project could be composed of different employees. Often, a crew might include a foreman and tower technicians who did not live close to each other or to the day's jobsite. While some of the operations employees resided in the two states where HTS had warehouses, Illinois and Ohio, others resided in Michigan and Wisconsin. Primarily, HTS serviced towers in Wisconsin, Ohio, and Illinois, with these three states accounting for roughly 97% of HTS's business in 2014. *Id.* at 27:21-24, 28:10-29:13. But HTS also serviced towers in other states, including Kentucky, Pennsylvania, Georgia and South Dakota. *See id.* at 27:17-20; Deposition of Jason Pietrzycki ("Pietrzycki Dep."), ECF No. 94-2, at 53:10-11, 101:19-23; Deposition of Tevin Gomez ("Gomez Dep."), ECF No. 94-5, at 24:16-17.[1]

---

[1] As noted above, Pietrzycki's proposed class under the IMWL is composed only of Illinois workers.

To get to the jobsites in all of these states, crew members had to drive. This lawsuit revolves around whether the compensation HTS paid to foremen and tower technicians properly reflected how much time they spent traveling in vehicles to jobsites.

## II. LEGAL STANDARD

"Under Section 216(b) of the FLSA, employees may bring a collective action on behalf of themselves and other 'similarly situated' employees against employers who violate the Act's minimum wage or overtime provisions." *Smallwood v. Illinois Bell Tel. Co.*, 710 F. Supp. 2d 746, 750 (N.D. Ill. 2010). A collective action proceeds in two steps. *Rottman v. Old Second Bancorp, Inc.*, 735 F. Supp. 2d 988, 990 (N.D. Ill. 2010). At step one, the court decides whether to conditionally certify a collective action. *Smith v. Family Video Movie Club, Inc.*, 2015 WL 1542649, at *2 (N.D. Ill. Mar. 31, 2015). Then, at step two, the court more stringently evaluates whether certification is appropriate. *Jirak v. Abbott Labs., Inc.*, 566 F. Supp. 2d 845, 848 (N.D. Ill. 2008). "At this stage, the court reviews several factors including the employment settings of the individual plaintiffs, defenses available to the defendant that may be individual to each plaintiff, and fairness and procedural considerations." *Madden v. Corinthian Colleges, Inc.*, 2009 WL 4757269, at *2 (N.D. Ill. Dec. 8, 2009).

A collective action under the FLSA is different from a class action certified under Federal Rule of Civil Procedure 23. *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1044 (N.D. Ill. 2003). But "the case law has largely merged the standards . . . ." *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013). Therefore, when a court is deciding whether to certify a collective action and a class action in one lawsuit, the court treats them as "a single class action" and applies "the Rule 23 standards." *Sanchez v. Roka Akor Chicago LLC*, 2016 WL 74668, at *5

(N.D. Ill. Jan. 7, 2016); *Elder v. Comcast Corp.*, 2015 WL 3475968, at *5 (N.D. Ill. June 1, 2015); *Dailey v. Groupon, Inc.*, 2014 WL 4379232, at *4 (N.D. Ill. Aug. 27, 2014).[2]

The party seeking class certification bears the burden of proving by a preponderance of the evidence that he is entitled to it. *Starr v. Chicago Cut Steakhouse, LLC*, 75 F. Supp. 3d 859, 871 (N.D. Ill. 2014); *Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 286 F.R.D. 355, 363 (N.D. Ill. 2012). He must prove that the proposed class meets the four requirements of Rule 23(a) and at least one of the three alternatives provided in Rule 23(b). *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1059 (7th Cir. 2016). Rule 23(a) requires numerosity, typicality, commonality, and adequacy of representation. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Only two of Rule 23(b)'s alternatives are relevant to this case. Under Rule 23(b)(2), certification is proper "when the plaintiffs' primary goal is not monetary relief, but rather to require the defendant to do or not do something that would benefit the whole class." *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 441 (7th Cir. 2015). Under Rule 23(b)(3), certification is proper when questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members, and a class action is superior to other methods of resolving the controversy. *Messner*, 669 F.3d at 811.

### III. DISCUSSION

**A.    HTS's General Compensation Structure**

All of HTS's foremen and tower technicians are nonexempt employees. Overholt Dep., at 100:18-20. HTS paid all of them hourly wages. *Id.* at 13:2-5, 16:3-10. HTS paid all of them overtime. *Id.* at 13:6-8, 16:11-18. Specifically, HTS paid foremen and tower technicians one-

---

[2] Even if the collective action standards controlled, instead of the Rule 23 standards, the Court's ruling on Defendants' Motion for FLSA Decertification would not change.

and-one-half times their hourly rates of pay for each hour of overtime. *Id.* at 16:11-21. It was

HTS's "uniform practice" to compensate foremen and tower technicians in this manner. *Id.* at

17:22-18:13. At one point in time, HTS paid its foremen and tower technicians the same wage

for the time they spent working and the time they spent traveling in vehicles to jobsites.

Pietrzycki Dep., at 32:23-33:7. But that changed, seemingly around 2011 to 2012. *Id.*;

Deposition of Tab Petersen, Jr. ("Petersen Dep."), ECF No. 94-3, at 38:5-22.

After this change, HTS paid each foreman and tower technician different hourly wages,

depending on what he or she was doing. Each of these employees earned a higher hourly wage

(which the Court will refer to as a "regular wage") when performing certain activities, such as

working at a jobsite. Overholt Dep., at 18:17-20:5. Each also earned a lower hourly wage of

$10 ("drive time wage" for short) for what HTS called "Drive Time." *Id.* It was HTS's

"practice" not to include drive time wages when determining a foreman or tower technician's

regular rate of pay, as defined in the FLSA. *Id.* at 101:11-24, 131:18-21. It also was HTS's

"standard practice" not to include drive time when calculating the number of overtime hours

worked in a given week. *Id.* at 131:5-12.

HTS maintained a system for tracking how foremen and tower technicians spent their

time. Every day, each crew's foreman filled out a Daily Activity Report ("DAR") on his or her

laptop. *Id.* at 59:21-60:6, 60:20-23, 62:22-23, 84:15-19. A DAR reported in very general terms

what the crew completed during the day, without necessarily specifying which crew member

performed a certain task. *Id.* at 90:12-19; Pietrzycki Dep., at 106:3-8; Petersen Dep., at 9:8-

10:15. Importantly, the DARs listed for each crew member: (1) the total number of hours for

which he or she should be paid his or her regular wage, and (2) the total number of hours for

which he or she should be paid the drive time wage. Overholt Dep., at 63:4-64:5; 67:15-24; *see also* Deposition of Allen Robinson ("Robinson Dep."), ECF No. 94-4, at 15:7-19.

HTS did not maintain any records other than the DARs that tracked how much time foremen and tower technicians spent working. Overholt Dep., at 62:1-5; *see also* Petersen Dep., at 22:10-13. HTS trusted its foremen to accurately record the total time for which crew members earned either wage. Overholt Dep., at 67:6-14, 68:6-12. HTS does not appear to have had written guidelines instructing foremen how to fill out DARs. *See* Petersen Dep., at 52:20-23. But HTS provided at least some training. *Id.* at 62:22-63:16; Robinson Dep., at 16:16-18, 131:3-19. Moreover, HTS's Rule 30(b)(6) witness, Matthew Overton, who serves as the company's Controller, said that DARs were reliable sources of information that reliably indicated the amount of time each employee earned his or her regular wage and the drive time wage. Overholt Dep., at 122:15-123:13.

After the foremen completed their DARs, they sent them to HTS's payroll clerk, who put the relevant information into Employee Job Detail Reports and Timecard Lists. *Id.* at 135:20-136:4. These records were then used to produce each employee's paystub, which listed as a separate item the number of drive time hours worked, the drive time wage, and the total compensation earned for drive time. *See, e.g.,* ECF No. 52-3. HTS has the ability to run summaries on these records to tabulate how much drive time each employee worked (as reflected in these payroll-related records) over a certain period of time. Overholt Dep., at 136:5-13.

**B.    Paying the Drive Time Wage**

According to HTS's Rule 30(b)(6) deponent, it was the company's "custom and practice" to pay the drive time wage to all foremen and tower technicians who were passengers in a company vehicle traveling to a jobsite. Overholt Dep., at 102:16-23; *see also id.* at 75:17-21;

Peterson Dep., at 94:16-96:4 (explaining that whether time was marked as drive time or regular time was standard and consistent, and should not vary from crew to crew). But HTS "always" paid foremen and tower technicians their regular wages, rather than the drive time wage, for time they spent driving an HTS-owned vehicle to a jobsite. Overholt Dep., at 64:3-5, 98:2-11; *see also* Petersen Dep., at 37:14-19, 56:6-12; Deposition of Curtis Duncan ("Duncan Dep."), ECF No. 94-6, at 42:16-19; Robinson Dep., at 190:5-8. Also, HTS paid foremen and tower technicians their regular wages when they did work (color-coded wires, reviewed blueprints, filled out forms, etc.) while traveling to a jobsite in an HTS-owned vehicle (even if they were passengers, not drivers). Overholt Dep., at 74:4-10, 75:17-21, 80:21-81:4, 81:13-82:10, 83:2-6; *see also* Pietrzycki Dep., at 32:23-33:7, 43:12-44:2, 142:13-143:11; Petersen Dep., at 44:7-45:6, 61:21-62:4, 63:8-16; Robinson Dep., at 118:15-22, 190:5-8.

The parties dispute whether HTS consistently paid the drive time wage to foremen and tower technicians when they drove a personal vehicle from their homes to a jobsite. When asked if an employee is paid the drive time wage when driving separately, HTS's Rule 30(b)(6) deponent said, "Yes." Overholt Dep., at 121:2-4. He also explained that HTS trained foremen to record on DARs when an employee traveled separately. *Id.* at 85:10-17. Other deposition testimony supports this understanding. *See* Pietrzycki Dep., at 114:12-115:2; Robinson Dep., at 29:3-9; Petersen Dep., at 55:20-56:5. The only contrary evidence cited by Defendants is the deposition of Tevin Gomez. [ECF No. 99, at 11-12.] The page cited by Defendants, however, does not exist; although Defendants cited "p. 86," Gomez's deposition ends at page 85. [ECF No. 94-5, at 22.] Thus, Defendants have not identified anything in the record showing that HTS did not consistently pay the drive time wage for travel in personal vehicles.

Moreover, the Court has reviewed Gomez's deposition in its entirety and cannot find any contrary testimony based on personal knowledge. As a general matter, Gomez testified he had very limited personal knowledge of HTS's compensation structure. For instance, Gomez testified he "never" tried to figure out in-depth what he was supposed to be paid. Gomez Dep. at 49:4-11. Relatedly, he stated he "didn't really look into . . . too much" whether HTS was paying him properly. *Id.* at 48:21-49:3. Unsurprisingly, in light of this testimony, Gomez admitted he "probably didn't" understand the breakdown between his regular wage and the drive time wage, saying he "didn't really too much know anything like that." *Id.* at 49:12-19. Gomez also described how he relied solely on HTS's paystubs to determine for how many hours he earned his regular wage and for how many hours he earned the drive time wage. *Id.* at 74:11-14. Consistent with this general lack of knowledge, Gomez's deposition contains several contradictions and multiple admissions of lack of knowledge about basic aspects of HTS's compensation practices. *See, e.g., id.* at 18:17-19:18 (claiming that the drive time wage was time-and-a-half, and then conceding a lack of knowledge about the amount of the drive time wage); *id.* at 43:2-6 (Q: "And it's your understanding that you were paid drive time when you were at the Columbus warehouse?" A: "I'm not sure how that went. I'm really not.").

Gomez's testimony with respect to travel in a personal vehicle is consistent with this lack of knowledge. Gomez said that he was told during an interview that he was not required to drive to jobsites in an HTS-owned vehicle. *Id.* at 33:19-34:16.[3] In the context of talking about this "interview," Gomez also asserted in a solitary deposition answer that, if an employee drove a personal vehicle to a warehouse or jobsite, "I want to say you didn't get the drive time." *Id.* at 34:4-9. Gomez's deposition testimony does not reveal what personal knowledge he has that supports this equivocal statement. Further, Gomez never drove a personal vehicle to a

---

[3] It is unclear whether Gomez learned anything about the drive time wage from the interview.

warehouse or jobsite because he did not have a car. *Id.* at 34:10-16. And he never saw any other HTS employee drive a personal vehicle to a warehouse or jobsite. *Id.* at 35:4-7. Therefore, there is no indication that Gomez had any personal knowledge of whether HTS paid the drive time wage for time spent driving a personal vehicle to a jobsite.[4]

Finally, in some instances—and it appears from the record currently before the Court that these instances are rare—a foreman may have marked regular wage time on a DAR when he or she should have marked drive time. For instance, Allen Robinson, a former HTS foreman who is now in safety and quality management at the company, said in his deposition that he would sometimes credit someone on his crew with regular wage time even when that employee should have received drive time. *See, e.g.,* Robinson Dep., at 35:7-18. To be clear, though, Robinson's deposition testimony reveals that he usually followed HTS's normal policy, as described above. While Robinson would bend the rules at times to do "a favor" for members of his crew who were hard workers, he did not get permission from HTS before doing so. *Id.* at 137:2-13. Moreover, he admitted that doing so was contrary to HTS's "policy." *Id.*[5]

---

[4] Even were the Court to speculate that Gomez learned this fact through the interview, it is not clear that would be enough to establish personal knowledge. Simply repeating hearsay is not the same as laying foundation. *See MCI Worldcom Network Servs., Inc. v. Atlas Excavating, Inc.*, 2005 WL 1300766, at *5 (N.D. Ill. Feb. 23, 2005). While the Court could speculate that the interviewer may have worked for HTS, meaning his or her statements would not be hearsay, *see* FED. R. CIV. P. 801(d)(2), Gomez did not testify that the interviewer was an HTS employee; in fact, he did not remember with whom he interviewed, Gomez Dep., at 34:2-3. Therefore, the deposition does not provide a sufficient basis for the Court to conclude that what the interviewer said was not hearsay even if the record indicated, which it does not, what the interviewer said to Gomez. *See Overton v. City of Harvey*, 29 F. Supp. 2d 894, 904-05 (N.D. Ill. 1998).

[5] Robinson also claimed that, on occasion, he called Motter to ask if he could mark regular wage time for himself. Robinson Dep., at 120:1-23. These were one-off occurrences, and Robinson only did this about a dozen times during his many years at HTS. *Id.* Moreover, Robinson said he made these requests when he expected to do work in the car. *Id.* at 189:8-15. It also appears that Robinson may have been driving during some of these instances. Thus, even if Motter granted Robinson's requests under these circumstances, it seems that would have been consistent with HTS's policy, not contrary to it.

**C.     The Meaning of Drive Time within the Context of Pietrzycki's Proposed Class Definition**

Pietrzycki proposes in his brief that the Court certify a class that includes "all current and former HTS Tower Technicians and Foreman (sic) who received compensation for Drive Time and who worked in Illinois since August 25, 2011." [ECF No. 87, at 5.] The phrase "Drive Time" is not defined within the context of Pietrzycki's proposed class definition. While Pietrzycki notes that HTS's Rule 30(b)(6) deponent defined drive time as "time spent riding in a vehicle," Pietrzycki does not state that he intends this broad definition of the phrase to be incorporated within the class definition.

Pietrzycki is not claiming that HTS failed to pay its employees the drive time wage when it was supposed to pay them that wage. He clearly states, "To the extent that a non-Drive Time rate was applied (or no rate at all) through discretion or otherwise, Plaintiffs will not seek damages in this case for those hours." [ECF No. 99, at 11.] Instead, "[d]amages are based on the number of Drive Time hours—according to HTS's payroll records." *Id.* In other words, Pietrzycki is "only seeking to recover for those hours that were recorded [by HTS] as 'Drive Time.'" *Id.* Pietrzycki is "not seeking more hours," but rather the "overtime pay on the Drive Time hours as determined by HTS and . . . identified as such on payroll records." *Id.*

This understanding of Pietrzycki's claims is confirmed by reading his Second Amended Complaint. [ECF No. 74.] His regular rate claim is premised on the allegation that Defendants "failed to capture all remuneration *paid*" because they "did not include compensation *earned* through Drive Time . . . ." *Id.* ¶ 24 (emphasis added). As this language unambiguously illustrates, Pietrzycki's regular rate claim turns on how HTS treated the drive time wages that it actually paid. The same is true with respect to Pietrzycki's total hours claim. *Id.* ¶ 23. This

conclusion is confirmed by the proposed class definition which only includes those "who *received* compensation for Drive Time." [ECF No. 87, at 5] (emphasis added).

In light of Pietrzycki's actual claims, therefore, drive time should be understood to refer to the time spent traveling in a vehicle to a jobsite *for which HTS paid the drive time wage* as reflected in HTS's payroll records. Drive time should not be understood as referring to all time spent riding in a vehicle, including travel time for which HTS paid no compensation or paid regular wages.

**D.    Pietrzycki's Claims**

Pietrzycki's first claim is that, despite a legal duty to do so, Defendants did not count drive time recorded in HTS's payroll records when calculating how many total hours each employee worked during a given week. [ECF No. 74, ¶¶ 19, 40, 45, 47; ECF No. 86, ¶ 6; ECF No. 87, at 2, 4.] As a result, Pietrzycki argues, Defendants determined that employees worked fewer hours than they actually did. In turn, this failure led Defendants to undercount the number of overtime hours worked by employees.

Pietrzycki's second claim turns on the meaning of "regular rate," as used in the below-quoted provisions of the FLSA and the IMWL. The FLSA defines "regular rate" to include, subject to some exceptions (as always), "all remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C. § 207(e). Pietrzycki asserts that HTS did not include drive time wages when calculating each employee's regular rate. [ECF No. 74, ¶¶ 19, 40, 45, 47; ECF No. 86, ¶ 6; ECF No. 87, at 2-4.] This, in turn, allegedly led HTS to pay its employees a lower regular rate than it should have paid.

The FLSA and the IMWL require employers to pay their non-exempt employees one and one-half times the regular rate for any hours worked in excess of 40 hours per week, unless a

11

relevant exemption applies. *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012); *Brand v. Comcast Corp.*, 135 F. Supp. 3d 713, 726 (N.D. Ill. 2015). Specifically, 29 U.S.C. § 207(a)(1) provides that non-exempt employees shall not be employed "for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The IMWL imposes a parallel requirement, again subject to some exceptions, that "no employer shall employ any of his employees for a workweek of more than 40 hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than 1 1/2 times the regular rate at which he is employed." 820 ILL. COMP. STAT. 105/4a. As the similarity of these two provisions illustrates, the "IMWL parallels the FLSA . . . ." *Skelton v. Am. Intercontinental Univ. Online*, 382 F. Supp. 2d 1068, 1074 (N.D. Ill. 2005), *amended*, 2005 WL 2649190 (N.D. Ill. Oct. 11, 2005). Therefore, the same analysis applies to claims made under the FLSA and the IMWL. *Id.*; *see also Driver v. AppleIllinois, LLC*, 917 F. Supp. 2d 793, 798 (N.D. Ill. 2013); *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 355 (N.D. Ill. 2012); *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 784 (N.D. Ill. 2011). Consistent with this principle, none of the parties in this case distinguished between the FLSA claims and the IMWL claims in their class certification arguments.

## E.     Federal Rule of Civil Procedure 23(a)

The four requirements for class certification under Federal Rule of Civil Procedure 23(a) are numerosity, typicality, commonality, and adequacy of representation. *Messner*, 669 F.3d at 811.

In this case, two of these requirements, numerosity and adequacy, are not in dispute. Therefore, the Court will briefly address these before turning to the contested issues.

**1. Numerosity**

The numerosity requirement is satisfied where a class is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1); *see also Parko v. Shell Oil Co.*, 739 F.3d 1083, 1084 (7th Cir. 2014), *reh'g denied* (Mar. 10, 2014). To establish that a class is sufficiently numerous, a plaintiff need not identify exactly how many members will be in the class. *Barnes v. Air Line Pilots Ass'n, Int'l*, 310 F.R.D. 551, 557 (N.D. Ill. 2015). In assessing the size of a class, a court "may rely on common sense assumptions and reasonable inferences . . . ." *Beley v. City of Chicago*, 2015 WL 8153377, at *2 (N.D. Ill. Dec. 7, 2015).

As previously discussed, the Court understands Pietrzycki's proposed class to include "all current and former HTS Tower Technicians and Forem[e]n who received compensation for Drive Time [as reflected in HTS's payroll records] and who worked in Illinois since August 25, 2011." [ECF No. 87, at 5.] According to Pietrzycki, HTS has identified 123 foremen and tower technicians, of whom about three-quarters worked from Illinois. *Id.* at 6. Based on these numbers, Pietrzycki estimates the size of the proposed class to be roughly 90 employees. *Id.* Defendants have not contested the issue of numerosity.

The Court finds the proposed class to be sufficiently numerous. Indeed, "the number forty is often cited as the point at which joinder becomes impracticable." *Smith v. Family Video Movie Club, Inc.*, 311 F.R.D. 469, 476 (N.D. Ill. 2015); *Sturdy v. A. F. Hauser Inc.*, 2014 WL 2210391, at *2 (C.D. Ill. May 28, 2014); *Fonder v. Sheriff of Kankakee Cty.*, 2013 WL 5644754, at *6 (C.D. Ill. Oct. 15, 2013). The proposed class in this case is more than double that size.

## 2. Adequacy

Federal Rule of Civil Procedure 23(a)(4) requires that the representative parties of a class "will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). To assess whether this requirement is satisfied, a court must consider both "the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and . . . the adequacy of the proposed class counsel." *Healey v. Int'l Bhd. of Elec. Workers, Local Union No. 134*, 296 F.R.D. 587, 593 (N.D. Ill. 2013) (quoting *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011)); *see also Sanchez v. Roka Akor Chicago LLC*, 2016 WL 74668, at *4 (N.D. Ill. Jan. 7, 2016).

To be an adequate representative, the named plaintiff "'must be part of the class and possess the same interest and suffer the same injury as the class members.'" *Steimel v. Minott*, 2014 WL 1213390, at *18 (S.D. Ind. Mar. 24, 2014) (quoting *Am. Chem. Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)), *aff'd sub nom. Steimel v. Wernert*, 2016 WL 2731505 (7th Cir. May 10, 2016). "Absent any conflict between the interests of the representative and [other class members], and absent any indication that the representative will not aggressively conduct the litigation, fair and adequate protection of the class may be assumed." *In re Gen. Motors Corp. Dex-Cool Products Liab. Litig.*, 241 F.R.D. 305, 313 (S.D. Ill. 2007) (internal quotation marks omitted); *see also Phillips v. WellPoint Inc.*, 2012 WL 4904523, at *6 (S.D. Ill. Oct. 15, 2012); *Cima v. WellPoint Health Networks, Inc.*, 250 F.R.D. 374, 380 (S.D. Ill. 2008).

In this case, Pietrzycki's claims are essentially identical to the claims of other potential class members. Pietrzycki worked as both a foreman and a tower technician while he was employed by HTS. Pietrzycki worked at HTS during the class period and was one of HTS's longer-tenured employees. HTS compensated Pietrzycki in the same way that it compensated its

other foremen and tower technicians. Moreover, there has not been any indication that Pietrzycki has been less than diligent in pursuing this case. According to his counsel, Pietrzycki has "cooperated throughout this litigation . . . ." [ECF No. 87, at 9-10.] Thus, the Court finds that Pietrzycki can adequately represent the interests of all potential class members. Defendants have not argued otherwise.

To satisfy the adequacy requirement, proposed class counsel "must be experienced and qualified and generally be able to conduct the litigation." *Young v. Fortis Plastics, LLC*, 294 F.R.D. 128, 137 (N.D. Ind. 2013), *modified in part sub nom. Lace v. Fortis Plastics LLC*, 2015 WL 1383806 (N.D. Ind. Mar. 24, 2015). David Fish, Pietrzycki's counsel and the proposed class counsel, has submitted a declaration demonstrating his academic credentials, and litigation experience in labor/employment cases as well as class actions. [ECF No. 87-5.] His law firm, The Fish Law Firm, P.C., has pursued this lawsuit from its inception to the present moment. The Court has not observed any indication that Mr. Fish or his firm has been less than diligent in this capacity. Thus, the Court finds that proposed class counsel can adequately represent the class. Again, Defendants have not argued to the contrary.

### 3. Commonality

Federal Rule of Civil Procedure 23(a)(2) "requires that the class claims involve 'questions of law or fact common to the class.'" *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497 (7th Cir. 2012) (quoting FED. R. CIV. P. 23(a)(2)). Even a single common question is enough to satisfy this commonality requirement. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 376 (2011). The common question cannot be "superficial." *Jamie*, 668 F.3d at 497. Instead, commonality "requires the plaintiff to demonstrate that the class members have suffered the same injury" and that the class claims "depend on a common contention" that "is capable of

classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 349-50; *see also Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015). The proposed class's members, however, need not have identical claims, and "some degree of factual variation will not defeat commonality" if the common question can yield a common answer. *Gehrich v. Chase Bank USA, N.A.*, 2016 WL 806549, at *4 (N.D. Ill. Mar. 2, 2016); *see also Bell*, 800 F.3d at 374.

In this case, Pietrzycki identifies three common questions. [ECF No. 87, at 8.] The first is "[w]hether Drive Time hours must be included in determining the 'regular' rate of pay." *Id.* This issue matters in this case because 29 U.S.C. § 207(a)(1) provides that non-exempt employees shall not be employed "for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The FLSA defines "regular rate" to include "all remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C. § 207(e). Whether drive time wages are "remuneration for employment paid to, or on behalf of, the employee" is a question that will have one answer. It is a yes or no question that does not turn on any facts that vary employee-by-employee. Defendants have not argued that this issue is incapable of classwide resolution.

The second, related question is "whether 29 U.S.C. § 207(e) provides any applicable exemptions from including Drive Time in the regular rate of pay." [ECF No. 87, at 8.] As this question would imply, 29 U.S.C. § 207(e) has eight exclusions that limit the broad definition of "regular rate." If one of these applies, the proposed class's claims would seem to fail. None of these exemptions appear to turn on individualized facts, and Defendants have not argued that this issue is incapable of classwide resolution.

The third common question identified by Pietrzycki is "whether the Defendants' custom and practice of compensating for Drive Time (even at a lower rate of pay) requires that such hours count towards overtime purposes and whether the time spent driving constitutes work requiring compensation." [ECF No. 87, at 8.] This issue is crucial in this case. Under the FLSA, "[n]ot all work-related activities constitute 'work' that must be compensated." *Musch v. Domtar Indus., Inc.*, 587 F.3d 857, 859 (7th Cir. 2009). Specifically, under 29 U.S.C. § 254(a) —part of the Employee Commuting Flexibility Act of 1996, which amended the Portal-to-Portal Act of 1947, 29 U.S.C. § 254—the FLSA does not cover "(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and (2) activities which are preliminary to or postliminary to said principal activity or activities." *Gallardo v. Scott Byron & Co.*, 2014 WL 126085, at *6 (N.D. Ill. Jan. 14, 2014). Defendants contend that this statutory provision precludes the proposed class's claims. [ECF No. 94, at 22.]

Section 254(b), however, provides "that subsection (a) does not relieve an employer of liability when such activity is compensable by contract, custom, or practice." *Graham v. City of Chicago*, 828 F. Supp. 576, 579 n.2 (N.D. Ill. 1993); *see also O'Brien v. Encotech Const.*, 2004 WL 609798, at *4 n.9 (N.D. Ill. Mar. 23, 2004) ("The activity could also be time covered by the statutes if it is compensable under the terms of a contract or based on custom or practice."). Thus, the factual question of whether HTS had a custom or policy of paying the drive time wage is essential to this case. Of course, the existence of a custom and practice is only capable of classwide resolution. Either HTS had a custom and practice of doing something or it did not. This fact *cannot* vary from employee to employee. That is, HTS cannot have had a custom and practice for one employee and not for another. If that were the case, HTS simply would not have

17

had a custom and practice. The related legal question, whether that custom and practice is sufficient under 29 U.S.C. § 254(b) to make drive time into compensable work within the meaning of the FLSA, also is a question capable of classwide resolution.

Defendants' efforts to complicate these common questions are unsuccessful. Specifically, Defendants note that HTS paid regular wages to the driver of a company-owned vehicle and to the passengers in that vehicle who were working while traveling in the vehicle. [ECF No. 94, at 11.] This seems to point to the existence of a custom and practice, rather than cut against it. Moreover, to the extent this occurred, Pietrzycki's claims will not reach such hours because they were not paid as drive time hours on HTS's books. Defendants also contend that employees were only sporadically paid for traveling in their personal vehicles and that foremen had discretion to decide whether to award the drive time wage. *Id.* at 10-12. As detailed previously, neither of these assertions is supported by the record now before this Court.

Regardless, all of Defendants' factual variations miss the mark. If Pietrzycki were asserting that HTS failed to pay drive time wages when it should have paid them, then the proposed class's claims would require the Court to decide when each employee should have been paid the drive time wage and whether HTS paid or did not pay the drive time wage in that specific instance. As already explained, though, that is not Pietrzycki's claim. Instead, this case has to do with whether HTS, when calculating each employee's regular rate and overtime hours, failed to include drive time wages that it *actually paid* to the respective employee and his or her corresponding drive time, and, if HTS did so, whether that was lawful. In essence, all of Defendants' arguments reference a point that is too early in the compensation process. Defendants are focused on the decision to pay drive time wages. But this case has to do with

whether and how HTS incorporated paid drive time wages into employees' overtime compensation.

The flaw in Defendants' argument is highlighted by one of the cases upon which they rely. In *Dailey v. Groupon, Inc.*, a group of Account Representatives sued Groupon, their employer. 2014 WL 4379232, at *1. The employees claimed that Groupon failed to include earned commissions when calculating their regular rates of pay. *Id.* Groupon responded by arguing that the plaintiff employees fell within the FLSA's administrative exemption. *Id.* at *4. The Court recognized that this specific issue demanded an evaluation of each plaintiff's "*actual* day-to-day job duties.*" *Id.* at *5. Crucially, though, the Court described how Groupon lacked a "systemized process" of supervising these employees for part of the time covered by the lawsuit. *Id.* at *8. The Court noted that if the plaintiffs had limited their claims to the time when Groupon had a consistent company-wide policy regarding the work done by Account Representatives, then the commonality requirement could be satisfied. *Id.* This case, by contrast, deals solely with time periods that involve an allegedly uniform HTS custom and practice.

For that reason, this case is more analogous to *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360 (7th Cir. 2015). In *Bell*, the Seventh Circuit affirmed the district court's decision to certify a class of PNC Bank employees who claimed that PNC had an unofficial policy or practice of denying overtime. *Id.* at 372, 381. The court of appeals rejected the defendant's argument that the named plaintiff must prove the existence of a policy or practice before a class could be certified. *Id.* at 374-75. The Seventh Circuit instead explained that a court weighing class certification should evaluate the evidence "to determine whether a common question exists and predominates, without weighing that evidence to determine whether the plaintiff class will

ultimately prevail on the merits." *Id.* at 377. In the end, the court of appeals concluded that whether PNC had the alleged policy or practice was a common question capable of classwide resolution that justified certification under Federal Rule of Civil Procedure 23. *Id.* at 375.

For these reasons, the Court finds that the proposed class's claims raise multiple common questions of fact or law that are susceptible to classwide resolution.

**4. Typicality**

Under Federal Rule of Civil Procedure 23(a)(3), the claims or defenses of the representative parties must be typical of the claims or defenses of the class. *Chicago Teachers Union, Local 1 v. Bd. of Educ. of the City of Chicago*, 307 F.R.D. 475, 481 (N.D. Ill. 2015). "A claim is typical if it 'arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . her claims are based on the same legal theory." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006). As the above discussion reveals, Pietrzycki's claims are based on the exact same alleged practice and course of conduct that gives rise to the other proposed class members' claims. Likewise, his claims are based on the same legal theory. Neither party has presented an argument with respect to typicality that is substantively different from their commonality arguments. That is because the "commonality and typicality requirements of Rule 23(a) tend to merge," and they do so in this case. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 (1982). The Court finds Pietrzycki's claims are typical of the claims of the proposed class.

**F.     Federal Rule of Civil Procedure 23(b)**

Under Federal Rule of Civil Procedure 23, a class cannot be certified unless, in addition to meeting the four requirements of Rule 23(a), the class also meets at least one of the three alternatives in Rule 23(b). Only two of these are at issue in this case.

### 1. Rule 23(b)(2)

Under Rule 23(b)(2), a class may be certified where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . . ." FED. R. CIV. P. 23(b)(2). Pietrzycki contends that the class "would be protected by an injunction barring future failure to properly compute Drive Time." [ECF No. 87, at 11.] Although the operative complaint does not specifically seek injunctive relief, that request may be included in the general prayer for "other legal and equitable relief as this Court may deem appropriate." [ECF No. 74, at 9, 11.] Further, the Second Amended Complaint seeks declaratory relief. And Defendants have not presented any argument against certification under Rule 23(b)(2). Thus, the Court finds this requirement to be satisfied.

### 2. Rule 23(b)(3)

Rule 23(b)(3) "allows for class certification when 'questions of law or fact common to the class members predominate over any questions affecting individual members' and 'when a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Chicago Teachers Union*, 797 F.3d at 443 (quoting FED. R. CIV. P. 23(b)(3)). Predominance does not exist where liability determinations will be individualized and fact-intensive or where affirmative defenses will require person-by-person evaluations. *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 2016 WL 305380, at *11 (N.D. Ill. Jan. 26, 2016). Predominance does not demand, however, that every element of each claim be susceptible to classwide proof. *Chicago Teachers Union*, 797 F.3d at 444. Instead, the predominance requirement is satisfied where "common questions represent a significant aspect

of a case and . . . can be resolved for all members of a class in a single adjudication." *Young*, 294 F.R.D. at 138 (quoting *Messner*, 669 F.3d at 815).

As the Court's discussion of the commonality requirement illustrates, many of the questions of law or fact in this case are common to the proposed class and capable of classwide resolution. Therefore, the Court's discussion here will focus on Defendants' arguments against predominance.

Defendants argue that the proposed class's theory of liability rests on the custom and practice exception to the Portal-to-Portal Act, 29 U.S.C. § 254(b), and they contend that the proposed class will be unable to prove the existence of any custom or practice. [ECF No. 94, at 21-22.] This argument misses the mark because the predominance analysis is not about whether a class ultimately will succeed on the merits. *Chicago Teachers Union*, 797 F.3d at 444. Pietrzycki need not prove at the certification stage that HTS had such a custom or practice, but, rather, he only must show that there are common questions "capable of proof at trial through evidence that is common to the class rather than individual to its members." *Messner*, 669 F.3d at 818. As previously explained, the existence of a custom or practice is such a common question.

Defendants also contend that they have individualized defenses under 29 C.F.R. § 778.320(b). That regulation, however, is only relevant where an employer and employee have "reasonably agreed not to treat time as hours worked." 29 C.F.R. § 778.320(b). In this case, Defendants have not identified any evidence that HTS reached such an agreement with even one of its employees. Instead, Defendants cite one page of one deposition which they characterize as showing that the deponent was "unsure as to whether employees get paid overtime on the drive time hours they work." [ECF No. 100, at 7.] Uncertainty as to whether a company pays

22

overtime for certain work is not the same as an agreement between the company and an employee not to count as hours worked the time for which the company does pay. Moreover, Defendants have not identified any fact or made any argument showing the supposed agreement was reasonable. Where no reasonable agreement exists, "29 C.F.R. § 778.320(b) does not apply." *Jones v. C & D Techs., Inc.*, 8 F. Supp. 3d 1054, 1068-69 (S.D. Ind. 2014). Thus, at this time, there is no indication that this regulation will create individualized issues in this case.

Defendants' main substantive predominance argument is that the ECFA, 29 U.S.C. § 254(a), provides a defense from any liability they might otherwise have for the proposed class's claims. As the employer, HTS would, at the merits stage, bear "the burden of proving that an exception applies to the general rule that 'work' is 'compensable' under the FLSA." *DeKeyser v. Thyssenkrupp Waupaca, Inc.*, 747 F. Supp. 2d 1043, 1051 (E.D. Wis. 2010). The ECFA provides that an employer shall not be liable under the FLSA for failing to pay an employee overtime compensation for "traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform." 29 U.S.C. § 254(a); *see also Brand*, 135 F. Supp. 3d at 731. Therefore, the ECFA typically relieves employers of liability under the FLSA for failing to provide compensation for "normal home to work travel." *Gallardo v. Scott Byron & Co.*, 2014 WL 126085, at *7 (N.D. Ill. Jan. 14, 2014). Crucially, though, the ECFA does not relieve an employer of liability where the employer either had a custom or practice of covering some activity, or contracted to do so. 29 U.S.C. § 254(b).

As already discussed, whether HTS had a custom or practice of paying for drive time is not an individualized question. With respect to his contract theory, Pietrzycki has identified evidence that HTS represented to each new employee that the company paid drive time wages. Specifically, HTS's Rule 30(b)(6) deponent stated,

23

Q: Well one of the —when you're trying to attract talent for tower technicians and foremen, one of the things you tell them the benefit of working at Heights Tower is that they're going to get paid $10 per hour when they're a passenger, Right?

A: Yea. That is covered, yes.

Q: You explain that all to them, correct?

A. Sure.

Overholt Dep., at 116:22-117; *see also* Petersen Dep., at 39:4-9 ("If I speak to new hires, I inform them of the situation" with respect to drive time wages). Defendants have not identified any contrary evidence or argued that such a representation was not made to every employee. Given the seeming uniformity of the operative facts, the related legal question—whether informing new employees that they will be paid drive time is sufficient to create the necessary contract—is susceptible to a common answer.

There is only one instance in which it seems that Defendants' § 254(a) defense may raise individualized issues. Pietrzycki asserts that, if the proposed class loses on the custom, practice, and contract theories, it will argue that § 254(a) could not, as a matter of law, relieve Defendants from liability for failing to include for overtime purposes the drive time from HTS's warehouses to jobsites that occurred after the foremen and tower technicians did work at HTS's warehouse. This contention may raise a common legal question capable of resolution without an in-depth consideration of what exact work each employee performed. If the Court were to find in Defendants favor on this legal question, the case would be over, with no need for any individualized inquiry. If the Court were to find in the proposed class's favor, that would necessitate individualized proof of damages sufficient to show exactly what drive time wages were paid for such travel. But individualized damages issues should not and will not preclude certification in this case.

Defendants rely heavily on two cases that discussed the impact of individualized damages. In *Groupon*, discussed above, the plaintiffs proposed "no method for calculating their individualized damages other than having hundreds, or even thousands, of individualized hearings." *Dailey*, 2014 WL 4379232, at *9. In the second case, the Seventh Circuit found that the damages inquiry would require 2,341 separate evidentiary hearings. *Espenscheid*, 705 F.3d at 773. The employee plaintiffs claimed they should be paid for time that they did not report to the company and was not tracked in any records. *Id.* at 774. Moreover, the company had a complicated piece-rate pay system that varied for every job and every employee. *Id.*

In this case, however, Pietrzycki has explained how this Court could use paystubs and other payroll records maintained by HTS to determine each employee's damages. If the proposed class wins on one of its custom, practice, or contract theories, the assessment of damages would be strictly mathematical. This is the type of inquiry that the Seventh Circuit has said could be conducted "effortlessly, mechanically." *Id.* at 773. If the proposed class loses on all of its claims, there will be no need for any damages inquiry, individualized or otherwise. The only instance in which a significantly individualized damages inquiry will be required is if the proposed class loses on the custom, practice, and contract theories but wins on the non-commuting theory. Even in this instance, though, the damages determination at least still would be limited to time identified on HTS's payroll records.

In other words, while there is the potential for some individualized damages issues in this case, there remain "common questions" that "represent a significant aspect of a case and . . . can be resolved for all members of a class in a single adjudication." *Young*, 294 F.R.D. at 138. The Seventh Circuit has recognized that an issue "'central to the validity of each one of the claims' in

a class action, if it can be resolved 'in one stroke,' can justify class treatment." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013).

Again *Bell* is instructive. In that case, PNC argued that common issues did not predominate over individualized ones because the court could find at the merits stage that PNC did not have a policy or practice of failing to pay overtime. *Bell*, 800 F.3d at 378. The Seventh Circuit refuted this contention, explaining that even such a finding would significantly advance the litigation because all of the class members' claims that were based on the existence of a policy or practice "would fail in unison." *Id.* Therefore, the court of appeals determined that class certification should not be denied solely because the common question with regards to PNC's policy or practice could be resolved in such a way as to leave only individualized claims. *Id.* at 379.

Although Pietrzycki has advanced some additional theories, this case is primarily about whether HTS had a custom or practice of paying for drive time wages that is sufficient to establish liability under the FLSA and the IMWL. The parties' briefs reflect as much, with their initial arguments focused solely on this theory and their latter briefs devoting most of their attention to it. This issue, which seems to be the most significant one in the case, is capable of classwide resolution. And, of course, there are the other non-individualized issues discussed in the commonality section of this Opinion. The Court finds that all of these common issues predominate over the possibility that Defendants' § 254(a) defense will require some individualized inquiry. *See Bell*, 800 F.3d at 379-81; *Gomez v. PNC Bank, Nat'l Ass'n*, 306 F.R.D. 156, 168 (N.D. Ill. 2014), *aff'd sub nom. Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360 (7th Cir. 2015) (distinguishing cases where "the plaintiffs either *alleged* in the first instance that the overtime denials at issue were the result of decisions made by individual managers, or the only

evidence in the record showed that no unofficial company-wide policy against payment of overtime existed); *Driver v. AppleIllinois, LLC*, 2013 WL 5818899, at *1 (N.D. Ill. Oct. 29, 2013) ("The class is held together by the common question of whether AppleIllinois' policy and practice prevented employees from earning their minimum wage and the common proof responsive to that inquiry.").

The second requirement of Rule 23(b)(3) is that a class action be superior to "other available methods for fairly and efficiently adjudicating the controversy." *Chicago Teachers Union*, 797 F.3d at 443 (quoting FED. R. CIV. P. 23(b)(3)). The relevant factors for this inquiry are: (1) "class members' interests in individually controlling the prosecution or defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members;" (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) "the likely difficulties in managing a class action." FED. R. CIV. P. 23(b)(3)(A)-(D). Neither party has even suggested that a potential class member has an interest in controlling a separate action or has been involved in separate, related litigation. Because the common issues in this case predominate over individualized issues, concentrating the claims in one forum will serve judicial economy. For this same reason, managing this class action should not be exceedingly difficult. *See Messner*, 669 F.3d at 815 n.5 ("There are so many common issues of law and fact relating to the issue of Northshore's liability, however, that the superiority requirement likely poses no serious obstacle to class certification here.").

Defendants' argument with respect to superiority—contained in one three sentence paragraph—relies on the same contentions that underlie their commonality, typicality, and predominance arguments. [ECF No. 94, at 23.] The Court has already explained its assessment

of these assertions, and need not repeat that analysis again.  Therefore, the Court finds that a class action is a superior method of resolving the claims at issue in this case.

**G.    Class Definition**

Accordingly, the Court will certify a class of Illinois workers under the IMWL that is comprised of "all current and former HTS Tower Technicians and Foremen who received compensation for Drive Time as reflected in HTS's payroll records and who worked in Illinois since August 25, 2011."

<strong>IV. CONCLUSION</strong>

For all of the reasons stated above, Pietrzycki's Amended Motion for Class Certification [ECF No. 86] is granted, and Defendants' Motion for FLSA Decertification [ECF No. 93] is denied.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: July 11, 2016